**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| METROPOLITAN TRANSPORTATION AUTHORITY DEFINED BENEFIT PENSION PLAN MASTER TRUST; MANHATTAN AND BRONX SURFACE TRANSIT OPERATING AUTHORITY PENSION PLAN; and METROPOLITAN TRANSPORTATION AUTHORITY OTHER POSTEMPLOYMENT BENEFIT PLAN,<br><br>        Plaintiffs,<br><br>        v.<br><br>ALLIANZ GLOBAL INVESTORS U.S., LLC; and ALLIANZ SE,<br><br>        Defendants. | No. 1:20-cv-7842<br><br><br>**JURY TRIAL DEMANDED**<br><br><br>**<u>COMPLAINT</u>** |

## I.    SUMMARY OF THE ACTION

1.    This case is about how the hard-earned pension funds of some of New York's hardest working public employees were decimated by the negligent and imprudent mismanagement of an investment manager that failed to act as a reasonably prudent manager would act in the face of an historic market dislocation, and failed to follow the "all-weather" hedging and risk-management strategies that it repeatedly touted as capable of "perform[ing] whether equity markets are up or down, smooth or volatile."

2.    The Metropolitan Transportation Authority ("MTA") is North America's largest transportation network, serving a population of 15.3 million people across a 5,000 square mile travel radius encompassing New York's metropolitan area.  With over 70,000 employees, the MTA network operates the nation's largest bus fleet and more subway and commuter rail cars than all other U.S. transit systems combined.  MTA workers include subway conductors, bus drivers, and many of the other essential workers who keep the New York metropolitan area's economy and society moving, including during the most dire stretches of the COVID-19 crisis when doing so put their and their families' health in jeopardy.  This commitment resulted in thousands of positive COVID-19 cases and over 130 deaths – the death benefits for which were covered by the MTA and paid or will be paid by some of the Plaintiffs in this action.  The Plaintiffs – the MTA Defined Benefit Pension Plan Master Trust (the "MTA Master Trust"), the MTA Other Postemployment Benefits Plan (the "MTA Retiree Benefits Plan"), and the Manhattan and Bronx Surface Transit Operating Authority Pension Plan (the "MaBSTOA Plan," and collectively, the "MTA Plaintiffs") – are responsible for overseeing and investing the pension and benefit funds for these hard-working essential employees.

3.    As part of that responsibility, beginning in 2008 the Plaintiffs invested nearly two hundred million dollars from MTA employee pension and benefit plans in funds managed by

Defendant Allianz Global Investors U.S. LLC ("AllianzGI"), a subsidiary of Defendant Allianz SE ("Allianz SE" and together the "Defendants" or "Allianz").  Specifically, they invested first in a fund called Structured Alpha 500 and later in the fund called Structured Alpha 1000 (the "SA 1000 Fund" or the "Fund"), which were part of a family of "Structured Alpha" funds.

4.     This family of funds in general, and the SA 1000 Fund in particular, focused on equity index options trading, and were repeatedly advertised by the Defendants as "all-weather" funds capable of generating returns in adverse market conditions with the ability to "protect risk from any overnight crashes."[1]  As the Structured Alpha Funds were designed and marketed as responses to market crashes like the one in 2008, the Defendants promised the Plaintiffs that their strategy was designed to "outperform during normal (up/down/flat) market conditions . . . [p]rotect against a market crash . . . [and] [n]avigate as wide a range of equity-market scenarios as possible." Notably, AllianzGI said that the investment process was "[d]esigned to outperform irrespective of the market environment."[2]

5.     To achieve this, the Defendants told the MTA Plaintiffs, and other public pension fund investors, that it would pursue a strategy focused on hedging and risk-management. Specifically, the strategy would seek to "[a]lways be a net buyer of put options, providing protection against a tail event or market crash."[3]  To put it differently, the Defendants promised the Plaintiffs that they would always buy effective insurance policies against a market downturn, so that if things went south, the fund would be protected.  In addition, the Defendants said that they would implement a robust risk-management program at both the firm and portfolio levels that

---

[1] Allianz "Structured Alpha 1000," August 2019 Presentation, pg. 13 ("August 2019 Presentation").

[2] Allianz "Structured Alpha 1000," December 2019 Presentation, pg. 16 ("December 2019 Presentation").

[3] December 2019 Presentation, pg. 16.

would monitor risk in real-time and work together with the trading strategies to ensure that the fund stood ready to bear the brunt of a market dislocation.

6.      That is not what happened.  As the world began to react to the rapid global outbreak of the novel coronavirus in January, February, and March 2020, the markets plummeted.  Between February 19, 2020 and February 28, 2020, the S&P 500 Index dropped 13%.  At the same time, the Chicago Board Options Exchange ("CBOE") Volatility Index, known by its ticker symbol VIX, which measures price fluctuations and typically signals the level of risk in the options markets, soared by over 280%.  Global stock markets reported the largest single-week decline since the 2008 financial crisis.  In short, the markets were panicking, volatility was on the rise, and prudent investment managers were looking to reduce risk and minimize their exposure.

7.      AllianzGI took a different approach.  Instead of exiting risky positions, such as short S&P 500 puts (which, as described below, effectively sold insurance policies to other investors) and short volatility index calls (which bet that volatitlity levels would not increase), AllianzGI maintained and increased its risky positions.  It did not 'cash out' on those positions, even though it was dealing in non-exotic products for which there was a liquid market.  To make matters worse, AllianzGI also failed to hedge the risk by not establishing an adequate position in long put options, which it told investors it would do, and which would have acted as an insurance policy against a further market drop.  In essence, AllianzGI made a directional bet that the market would normalize – a bet that carried tremendous risk and that stood in direct conflict with its stated investment strategy against directional positioning of the portfolio.

8.      As it turned out, AllianzGI's negligent and imprudent bet proved to be disastrous. Not only did the market fail to normalize, it continued its free-fall.  By March 23, the market had dropped an additional 24% since the end of February.  AllianzGI had positioned the SA 1000 Fund

for maximum damage, and by mid-March, the fund was down nearly 87% for the year.  The value of its investments had dropped by so much that it could not meet the margin calls of its prime brokers, and by the end of the month, AllianzGI had no choice but to liquidate the fund.  The MTA Plaintiffs would ultimately lose *over 97%* of the value of their investments during the first quarter of 2020.

9.      AllianzGI's negligent and imprudent trading strategies were only part of the problem; it's failure to implement adequate risk management procedures, despite its commitment to doing so, was another part.  AllianzGI failed to perform adequate stress testing (or at a minimum, it failed to heed the results of its stress testing), which should have identified the unreasonable levels of risk on its books.  It also failed to competently implement its restructuring strategy, which under certain circumstances – like those present in February and March 2020 – called for cashing out and reducing risk.  In addition, AllianzGI failed to utilize the resources of its global financial network, in particular by relying on its parent, Defendant Allianz SE, to assist in its risk management and to provide financial backing that could have helped it satisfy its prime brokers' margin calls and survive long enough to recoup the Plaintiffs' losses.

10.     Taken together, and as described more fully below, the Defendants failures were negligent, a breach of their contractual obligations to Plaintiffs, a breach of their fiduciary duty of care, and a direct and proximate cause of the Plaintiffs' harm.

## II.   PARTIES

### A.   Plaintiffs

11.     Plaintiff MTA Master Trust is a defined benefit pension plan provided by the Metropolitan Transportation Authority.  The MTA Master Trust is organized under the laws of and has its principal place of business in the state of New York.

12.     Plaintiff MaBSTOA Pension Plan is a defined benefit pension plan sponsored by the Manhattan and Bronx Surface Transit Operating Authority, a subsidiary of the New York City Transit Authority, which is an affiliate of the Metropolitan Transportation Authority.  The MaBSTOA Pension Plan is organized under the laws of and has its principal place of business in the state of New York.

13.     Plaintiff MTA Retiree Benefits Plan is a fund provided by the Metropolitan Transportation Authority to administer health, death, and welfare benefits.  The MTA Retiree Benefits Plan is organized under the laws of and has its principal place of business in the state of New York.

## B.     Defendants

14.     Defendant AllianzGI is a Delaware limited liability company with a principal place of business in New York, New York.  AllianzGI was the investment manager and Managing Member of the SA 1000 Fund.  AllianzGI's sole member was Allianz Global Investors U.S. Holdings LLC.

15.     Defendant Allianz SE is a German multinational financial services company. Allianz SE was incorporated under the laws of Germany and is headquartered in Munich, Germany.  Allianz SE is AllianzGI's corporate "parent" and it exerts significant control over AllianzGI.  As described in Allianz SE's 2019 Solvency and Financial Condition Report, it has a "dominant" influence over Allianz GI; it owns 100% of the capital share and voting rights in AllianzGI; and it uses 100% of AllianzGI for accounting consolidated accounts and group-wide solvency calculations.  In addition, Allianz SE has stated that its "business strategy is aligned with the strategy of Allianz Group," which includes AllianzGI.  At all relevant times, AllianzGI was Allianz SE's agent and was acting within the scope of that agency relationship and for Allianz SE's benefit.

C.     **Non-Party Affiliates of Defendants**

16.     Allianz Global Investors U.S. Holdings LLC is a Delaware limited liability company with a principal place of business in New York, New York. Allianz Global Investors U.S. Holdings LLC's sole member is Allianz Asset Management of America L.P.

17.     Allianz Asset Management of America L.P. is a Delaware limited partnership with its principal place of business in Newport Beach, California. Allianz Asset Management of America L.P.'s general partner is Allianz Asset Management of America LLC, and its limited partner is PFP Holdings, Inc.

18.     PFP Holdings, Inc. is a Delaware corporation with a principal place of business in Newport Beach, California.

19.     Allianz Asset Management of America LLC is a Delaware limited liability company with a principal place of business in Newport Beach, California.

20.     Allianz of America, Inc. holds a 99.8% non-managing interest in Allianz Asset Management of America LLC, and is a Delaware corporation with a principal place of business in Novato, California. Allianz of America, Inc. is an indirect wholly-owned subsidiary of Allianz SE.

21.     Allianz Asset Management AG holds a 0.1% non-managing interest in Allianz Asset Management of America LLC, and is a German corporation with its principal place of business in Germany. Allianz Asset Management AG is an indirect wholly-owned subsidiary of Allianz SE.

22.     Allianz Asset Management of America Holdings Inc. holds a 0.1% managing interest in Allianz Asset Management of America LLC, and is a Delaware corporation with a principal place of business in Newport Beach, California. Allianz Asset Management of America Holdings Inc. is a wholly-owned subsidiary of Allianz Asset Management AG.

23.    The relationship of the Defendants (outlined in red) and the various other non-party Allianz entities is summarized in the following illustration:



## III.    JURISDICTION AND VENUE

24.    This Court has jurisdiction over the causes of action asserted in this Complaint pursuant to 28 U.S.C. § 1331 insofar as the claims arise under the laws of the United States, and pursuant to 28 U.S.C. § 1367 insofar as all other claims are so related to the claims that arise under the laws of the United States that they form part of the same case or controversy.

25.    This Court also has jurisdiction over the causes of action asserted in this Complaint pursuant to 28 U.S.C. § 1332(a)(3) because the dispute is between domiciliaries of New York and domiciliaries of different U.S. states and of Germany, and the amount in controversy exceeds $75,000 exclusive of interest and costs.

26.    Venue is proper under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this District.

27. Venue is also proper by virtue of the parties' consent. Specifically, "[t]o the fullest extent permitted by law, in the event of any dispute arising out of the terms and conditions of this Agreement, the parties hereto consent and submit to the jurisdiction of the courts of the State of New York in the county of New York and the U.S. District Court for the Southern District of New York."[4]

## IV.    FACTUAL ALLEGATIONS

### A.    The Structured Alpha Portfolio

28. AllianzGI offered a family of funds as part of its Structured Alpha product portfolio, which included the SA 1000 Fund and a number of others, including, without limitation, Structured Alpha U.S. Equity 250 LLC, Structured Alpha Global Equity 350 LLC, Structured Alpha U.S. Equity 500 LLC, and Structured Alpha Global Equity 500 LLC (collectively, the "Structured Alpha Funds").

29. The Structured Alpha Funds were all primarily managed by the same AllianzGI investment team overseen by the same AllianzGI portfolio manager, Greg Tournant. In addition, they all employed parallel trading strategies, utilized the same investment products, and assumed similar risk profiles.

30. The Structured Alpha Funds were marketed by AllianzGI as "all-weather" funds capable of generating positive returns even in adverse market conditions. AllianzGI's stated goal was to "protect risk from any overnight crashes" and the funds were marketed as having the "ability to profit even when the market crashes."

---

[4] Fourth Amended and Restated Limited Liability Agreement of AllianzGI Structured Alpha LLC, December 31, 2017 ("LLC Agreement"), Section 8.06, pg. 30.

31.     To achieve this promising and lucrative prospect, AllianzGI designed and promoted its strategy so that market downturns and periods of sustained volatility would not only minimize losses, but also create the possibility for generating gains.  The primary component of this strategy was buying and selling options contracts, which (as described more fully below) would allow AllianzGI to profit from volatility fluctuations.  In particular, in what was billed as the cornerstone of this risk-adverse and "all-weather" program, AllianzGI touted its commitment to "buying deep out of the money puts," which, if properly positioned, served as the Fund's insurance policy against dramatic swings in volatility.

### B.     MTA Plaintiffs' Investments

32.     In reliance on these and other representations (as outlined more fully below), the MTA Plaintiffs decided to invest and to remain invested in the Structured Alpha Funds for over a decade, from 2008 to 2020.

33.     Plaintiff MaBSTOA Pension Plan initially invested $50,000,000 in the Structured Alpha 500 Fund on March 1, 2008.

34.     Plaintiff MTA Master Trust initially invested $70,000,000 in the Structured Alpha 500 Fund on June 1, 2009.

35.     The SA 1000 Fund began operations in August 2011.  At that time, MaBSTOA's and MTA Master Trust's investments were transferred from the Structured Alpha 500 Fund to the SA 1000 Fund, where they remained until 2020.

36.     Plaintiff MTA Retiree Benefits Plan initially invested $7,500,000 in the Structured Alpha 1000 Fund on May 1, 2014.

37.     The MTA Plaintiffs increased their investments in the Structured Alpha 1000 Fund by at least $63,000,000, as follows: (i) $10,000,000 added by the MTA Master Trust on August 1, 2014; (ii) $10,000,000 added by the MTA Master Trust on April 1, 2017; (iii) $33,000,000 added

by the MTA Master Trust on June 1, 2019; and, (iv) $9,000,000 added by the MaBSTOA Plan on June 1, 2019.

38.     As of December 31, 2019, the market value of the MTA Plaintiffs' investment in the SA 1000 Fund was $330,695,858.98.

39.     As of March 2020, the MTA Plaintiffs held over 20% of the equity interests in the SA 1000 Fund.

40.     Upon information and belief, additional benefit plan investors, as defined by the Employee Retirement Income Security Act of 1974 ("ERISA"), including some covered by Title I of ERISA, also held equity interests in the SA 1000 Fund.  For example, according to court records, certain ERISA employee pension benefit plans affiliated with Blue Cross and Blue Shield were invested in the SA 1000 Fund at the relevant time. (*See Blue Cross and Blue Shield Association National Employee Benefits Committee v. Allianz Global Investors U.S., LLC, et al.*, No. 20-cv-07606 (S.D.N.Y. filed on Sept. 16, 2020), ECF No. 1.)

41.     Upon information and belief, benefit plan investors, in the aggregate, held over 25% of the equity interests in the SA 1000 Fund during the relevant time.

**C.     SA 1000 Fund Governing Documents**

42.     The MTA Plaintiffs' investments were subject to a series of agreements that formalized AllianzGI's investment strategy and codified certain of its duties to its investors, including the duty that it would exercise reasonable "care, skill, prudence, and diligence"[5] in the management of the fund, and that if it didn't, it was liable to its investors for negligence.[6]

---

[5] AllianzGI Structured Alpha 1000 LLC Private Placement Memorandum, Effective April 1, 2017 ("PPM"), pg. 58.

[6] *See* LLC Agreement, Section 2.06, pg. 8.

43.     Most recently, these agreements consisted of: the Fourth Amended and Restated Limited Liability Company Agreement of AllianzGI Structured Alpha 1000 LLC, dated December 1, 2017 (the "LLC Agreement"); the AllianzGI Structured Alpha 1000 LLC Confidential Private Placement Memorandum, dated April 1, 2017 (the "PPM"); various subscription agreements; and various side letter agreements (the "Side Letter Agreements," and collectively, the "SA 1000 Agreements").

44.     The SA 1000 Agreements set out the relationship between the Plaintiffs and AllianzGI, as the Fund's Managing Member and investment manager.  Among other things, the SA 1000 Agreements contemplated that Allianz GI would act as a fiduciary, maintain a certain standard of care with respect to the Plaintiffs' assets, and be liable to them for its negligence.

### 1.     **AllianzGI's Duty of Care**

45.     According to the PPM, AllianzGI "is the Managing Member of the [SA 1000] Fund and thus is responsible for the general management of the investment portfolios of the [SA 1000] Fund."[7]   In this role, AllianzGI's actions constituted "the act of and serve[d] to bind the Company."[8]   In addition, AllianzGI also accepted an "appointment as the investment manager of the Company."[9]

46.     In carrying out these duties, AllianzGI agreed to use its "best efforts" to "exercise the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man

---

[7] PPM, pg. 3.

[8] LLC Agreement, Section 2.01, pg. 3.

[9] *Id*., Section 2.03, pg. 7.

acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."[10]

47.     AllianzGI also expressly assumed the role of a fiduciary.  In the PPM, AllianzGI agreed that "for so long as the assets of the Fund are treated as 'plan assets' for purposes of ERISA, the Managing Member is a 'fiduciary,' as such term is defined by ERISA."[11]  Likewise, AllianzGI agreed in the LLC Agreement that "to the extent that the underlying assets of the Company constitute 'plan assets' within the meaning of ERISA . . . [AllianzGI], in its capacity as 'investment manager' of the Company . . . shall at all times discharge its duties consistent with the standard of care imposed on fiduciaries under ERISA and/or Section 4975 of the [Internal Revenue] Code."[12] AllianzGI also agreed in its Side Letters that "during such times when the Fund is deemed to hold 'plan assets' . . .  the provisions of Title I of ERISA shall be deemed to govern the conduct, responsibilities and liabilities of the Managing Member with respect to the Subscriber [and] the Managing Member will act as a fiduciary as if the Subscriber was subject to Title I of ERISA."

48.     What is more, AllianzGI more generally agreed to act as a fiduciary, irrespective of whether there were any "plan assets" in the Fund.  In the PPM, AllianzGI agreed that "[d]uring any such time that the assets of the Fund are not treated as 'plan assets' for purposes of ERISA . . . the Managing Member nevertheless will use its reasonable best efforts to discharge its duties consistent with the standard of care imposed on plan fiduciaries under Section 404(a)(1)(B) of ERISA."[13]  This commitment was reiterated in the LLC Agreement where AllianzGI agreed "[t]o

---

[10] PPM, pg. 58.

[11] PPM, pg. 56.

[12] LLC Agreement, Section 2.12, pg. 11.

[13] PPM, pg .58.

the extent that the underlying assets of the Company do not constitute Plan Assets [under ERISA],
Allianz Global Investors U.S. LLC, in its capacity as 'investment manager' of the Company . . .
shall at all times use its reasonable best efforts to discharge its duties consistent with the standard
of care imposed on fiduciaries under Section 404(a)(1)(B) of ERISA."[14]

49.     If that were not clear enough, AllianzGI disposed of any doubt, when it stated
generally in the PPM that its "[c]onduct outside the safe harbor afforded by Section 28(e) [of the
Securities Exchange Act of 1934] is subject to the traditional standards of fiduciary duty under
state and federal law"[15] and where it acknowledged in the LLC Agreement that it would have
"fiduciary duties" to the Fund and its members.[16]

50.     The parties also expressly contemplated that AllianzGI would be liable to investors
for negligence.  The PPM states that Allianz would be liable to investors for "losses arising from
. . . [Allianz's] negligence."[17]  The LLC Agreement likewise states that AllianzGI would be liable
when its "action or inaction . . . constitutes . . . negligence."[18]

### 2.     AllianzGI's Investment Strategy

51.     The SA 1000 Agreements also clearly described AllianzGI's investment strategy
as designed to hedge against risk and to incorporate multiple layers of risk management.

52.     The PPM stated that the investment objective of the Fund is to "outperform the
BofA Merrill Lynch 3-Month U.S. Treasury Bill Index . . . by 1400 to 1600 basis points (14% -

---

[14] LLC Agreement, Section 2.12, pg. 11.

[15] PPM, pg. 42.

[16] LLC Agreement, Section 2.07, pg. 9.

[17] PPM, pg. 31.

[18] LLC Agreement, Section 2.06, pg. 8.

16%)," or, after taking into consideration AllianzGI's Incentive Allocation (discussed more fully below) and other expenses, "by approximately 1000 basis points (10%)."[19]

53.     To achieve this objective, AllianzGI committed to two parallel approaches; what it referred to as "alpha and beta sources."  The alpha component would "consist of investments in puts and calls on equity indices through the use of a proprietary model to construct option spreads."  The goal of the alpha component was to create "option based profit zones that, upon expiration of the options, will capture positive payoffs if the level of the underlying index (or other instrument) ends up within the profit zone."[20]  AllianzGI said it would seek "to optimize spread positions and profit zones based on (a) targeted positive return potential, (b) structural risk protections, (c) collateral management, and (d) flexibility to restructure profit zones if necessary."[21]  When one sells an option it is referred to as being "short" the option, and when one buys an option it is referred to as being "long" the option.

54.     The options that formed the basis of the "alpha source" fell into two buckets: call options and put options.  A call option is a contract in which the buyer of the option, in exchange for a premium, typically has the right but not the obligation to buy an underlying asset at a certain price, called a strike price, up until a certain point in time, called the expiration date.  The seller of the call option typically must sell the asset if the buyer exercises his/her right.  The buyer of the call option therefore makes a profit if the price of the underlying asset rises to exceed the strike price before the expiration date because he/she will then have the right to buy it for less than it is

---

[19] PPM, pg. 1.

[20] PPM, pg. 1.

[21] *Id*.

worth.  His/her profit will be equal to the difference between the strike price and the market price, less the amount of the premium paid up-front.

55.     A put option reverses the scenario.  Whereas the call option gave the buyer the right to buy the underlying asset, the put option is a contract in which the buyer of the option, in exchange for a premium, typically has the right but not the obligation to sell the underlying asset at a strike price up until the expiration date.  The seller of the put option must typically buy the asset if the buyer exercises his/her right.  The put option therefore acts as an insurance policy for the buyer, enabling him/her to sell the asset at a price greater than the market price.  In that way, the buyer profits by an amount equal to the difference between the strike price and the market price, less the amount of the premium paid up-front.  The put option has the potential to greatly benefit the buyer in times of high market volatility, which is the reason that buying puts was a central component of AllianzGI's strategy to perform in all market conditions.

56.     The SA 1000 Fund focused on "equity indices" options, also referred to as index options, which differ from equity options.  Whereas the underlying instrument of an equity option is a number of shares of a specific company's stock (usually 100 shares), index options are intangible financial derivatives that give the holder of an options contract the right to buy or sell the value of an underlying financial index, such as the Standard and Poor's (S&P) 500 or the CBOE Volatility Index.  The trading of index options does not involve the purchase or sale of an underlying asset and contracts are always settled in cash.  Index options have traded since 1983 within major marketplaces – including the Chicago Board Options Exchange – and since that time, billions of index options contracts have been traded.

57.     The SA 1000 Fund coupled the "alpha source" with the "beta source," which consisted of "investing in a portfolio that seeks to deliver a return equivalent" to the BofA Merrill

Lynch 3-Month U.S. Treasury Bill Index.[22]   The "beta source" would therefore act as the base-line, focusing on 90-day U.S. government bonds and seeking a return equivalent to the index, while the "alpha source" would seek to generate the excess 10% that AllianzGI cited as its objective.

### 3.   AllianzGI's Fee Structure

58.   The SA 1000 Agreements outlined AllianzGI's fee structure, which depended on the returns generated by the Fund in each quarter.

59.   Instead of a set management fee, AllianzGI's only source of revenue was through a mechanism called the "Incentive Allocation."  The "Incentive Allocation" stated that AllianzGI, as managing member, would be entitled to 30% of the portion of each member's net capital appreciation for each quarter that exceeded what the member would have earned if there was a return equal to the Benchmark (*i.e.*, the total return of the BofA Merrill Lynch 3-Month Treasury Bill index).[23]  For instance, if the fund's performance was equal to the Index + 15%, then Allianz would take 30% of the +15%, or approximately 4.5%.  If AllianzGI did not generate a return above the Benchmark in a quarter, it would receive nothing in compensation.[24]

60.   In addition, each member of the Fund would have a "Recovery Account" with a starting balance of zero (0).  At the end of each quarter, the Recovery Account would be increased by any amount that the Fund underperformed against the relevant Benchmark and decreased (not lower than 0) by any returns that outperformed the Benchmark.  The balance of each member's Recovery Account did not start at 0 every quarter, but instead was cumulative over time – as a result, AllianzGI could not collect an Incentive Allocation from a member during a given quarter

---

[22] PPM, pg. 1.

[23] PPM, pg. 6.

[24] *Id*.

unless and until underperformance from previous quarters was first earned back through returns on the Fund's investments.[25]

### D. AllianzGI Touted the SA 1000 Fund's Hedging Strategies and its Ability to Weather Downturns

61.     Outside of the SA 1000 Agreements, AllianzGI made additional representations throughout the life of the MTA Plaintiffs' investments, including during presentations in April 2012, June 2016, August 2019, and December 2019.  Throughout this time, AllianzGI remained consistent, and repeatedly demonstrated to Plaintiffs a commitment to adhere to a particular investment strategy.

62.     Similar to how it was described in the SA 1000 Agreements, Allianz repeatedly touted the SA 1000 Fund's focus on "pursu[ing] risk-managed returns via the options market" and how it was designed  to "perform whether equity markets are up or down, smooth or volatile" with the use of "[s]imple, liquid, listed instruments."[26]

63.     To do so, AllianzGI represented that it had a "three-pronged investment objective" to "outperform during normal (up/down/flat) market conditions . . . [p]rotect against a market crash . . . [and] [n]avigate as wide a range of equity-market scenarios as possible."[27]  Notably, AllianzGI said that the investment process was "[d]esigned to outperform irrespective of the market environment" and that the strategy specifically called for protecting the fund's investments from an "adverse market environment" by "[a]lways be[ing] a net buyer of put options, providing

---

[25] *Id*. pgs. 6-7.

[26] December 2019 Presentation, pg. 3.

[27] December 2019 Presentation, pg. 16.

protection against a tail event or market crash."[28]  AllianzGI further promised its investors that it would "[n]ever make a forecast on the direction of equities or volatility."[29]

64.    The investment process that AllianzGI promised its investors it would implement – which it referred to as a "modified Iron Condor," a strategy of buying and selling different options to profit from low volatility – was likewise three-pronged, and was illustrated with the following diagram:



65.    The first prong involved so-called "range-bound spreads."  This involved selling calls and puts (referred to as being "short" calls and puts), and was designed to create profit zones where the Fund would benefit from limited index movement.  In the example set forth below, for

---

[28] *Id.*

[29] *Id.*

instance, the Fund would sell call options at +6% as compared to the then prevailing market price, and sell put options at -9% of the then prevailing market price. If the market movement stayed within the +6% to -9% range, then the options would expire worthless, the buyers of the options would not have exercised their rights, and the portfolio would profit by collecting the premiums.



66.     The second prong involved "directional spreads" and was more complex. Here, the portfolio would buy and sell combinations of puts and calls to create zones of profit in the event the market moved even further than in the scenario contemplated by the "range-bound spread" strategy. For instance, in the following example, the portfolio would buy calls with a strike price at 6% over the index and sell calls with a strike price at 8% over the index. If the index rose

between 6 and 8%, the portfolio would then be in a profit zone by (i) exercising the calls it purchased at prices lower than those currently trading in the equity index from which they are derived (*e.g.*, the S&P 500), and (ii) collecting the premiums on the calls it sold since the strike price was never met and they would expire worthless.  At the same time, the portfolio would buy puts at -6% and sell puts at -14%.  This would allow them to profit on downward movement between -6 and -14% by (i) exercising the puts they purchased at prices greater than those currently trading in the equity index from which they are derived, and (ii) collecting the premiums on the puts they sold since the strike price was never met and they would expire worthless.  Thus, the portfolio would profit from index moves of -6 to -14% or +6 to +8%.



67.     The final, and most critical, component of AllianzGI's three-pronged investment process was hedging.  AllianzGI's stated approach to hedging was relatively simple, at least as compared to the range-bound and directional approaches: AllianzGI would buy puts to protect against a sudden market crash.  The puts would allow AllianzGI to exercise the options contracts above market prices in the event of a market crash and, at minimum, minimize its exposure to losses even if the puts were to eventually expire as worthless.  This was a key element of AllianzGI's investment strategy because it was the element that would provide the "protection against a tail event [*i.e.*, a low probability event] or market crash."  Indeed, during a presentation in June 2016, AllianzGI declared that "[t]hese [hedging] positions are designed for tail risk protection, not for outperformance potential, but are a key feature of the Strategy's risk management."[30]

68.     AllianzGI's approach to hedging was detailed and it was anchored by a commitment to buy put options "laddered for various market outcomes to the downside" with strike distances ranging from -10% to -25%.  (By "laddered," AllianzGI was referring to the practice of breaking the position into smaller positions at different prices and with different expiration dates.)  The hedging approach was detailed in the following diagram:

---

[30] Allianz "Structured Alpha," June 2016 Presentation, pg. 13 ("June 2016 Presentation"), pg. 13.



69.     AllianzGI told its investors that during normal market conditions, the fund was expected to "outperform in line with its stated return target."[31]   In times of volatile market conditions, the fund had the "potential for higher outperformance, lower active risk."[32]   When there is rapid change from low to high volatility, however, "[p]erformance could be more volatile than usual for a few weeks" and "[t]he portfolio could underperform for a few weeks," but the higher volatility levels "should enable greater outperformance in subsequent months."[33]   In other words, AllianzGI was telling its investors that if its strategy was implemented, the portfolio could exceed benchmarks even during times of high volatility.

---

[31] December 2019 Presentation, pg. 25.

[32] *Id*.

[33] *Id*.

70.     In addition to this investment strategy, specifically designed to respond to and take advantage of sharp market swings, AllianzGI also committed to a robust, multi-tiered risk management protocol, purportedly consisting of "multiple layers," including tail-risk hedging (such as that described above), real-time monitoring, and independent risk-oversight.  According to AllianzGI, this would include elements implemented both at the portfolio level and also more broadly at the firm level:



71.     Indeed, AllianzGI specifically told investors that IDS GmbH, Allianz's "global risk management provider," which was an "independent subsidiary of [AllianzGI's] parent, Allianz SE" would be involved in the risk management process,[34] and thus investors were led to believe

---

[34] December 2019 Presentation, pg. 5.

that the more general resources of Allianz SE, one of the largest financial services companies in the world, would be utilized in managing the Fund's risk.

72.     Allianz SE expressly assumed that role.  In its 2019 Annual Report, Allianz SE stated that its "Group Finance and Risk Committee (GFRC) provides oversight of the Group's and Allianz SE's risk management framework, acting as a primary early-warning function by monitoring the Allianz Group's and Allianz SE's risk profiles as well as the availability of capital." Allianz SE further stated that its overall "risk strategy places particular emphasis on protecting the Allianz brand and reputation, remaining solvent even in the event of extreme adverse scenarios, maintaining sufficient liquidity to always meet financial obligations, and providing resilient profitability."

73.     In addition, AllianzGI's committed to restructuring its positions should circumstances warrant.  AllianzGI stated that "restructuring when necessary is a vital component of our risk management process" and that "implementation varies depending on market conditions."[35]  As part of this strategy, AllianzGI contemplated that it would extend or shift the prices at which its options would be triggered, depending on how market conditions shifted its risk.  In addition, under certain risk conditions, AllianzGI acknowledged that it would even be appropriate to implement a "stop-loss" strategy, meaning that if positions proved too risky, AllianzGI could 'cash-out' and exit those risky positions.  Investors relied on AllianzGI's representation that exiting its positions and moving to cash was something it would do when the situation called for it.  These strategies were illustrated in the following diagram:

---

[35] December 2019 Presentation, pg. 23.



### E.   The MTA Investors' Reasonably Relied on AllianzGI's Ultimately Inaccurate Representations

74.    AllianzGI's representations concerning the types of investments the Fund would pursue and its overall investment philosophy, including the commitment to robust risk management and a focus on avoiding major losses during major market downturns, were integral to the investors' appraisal of the Fund and of AllianzGI's role as investment manager.

75.    The MTA Plaintiffs reasonably relied on AllianzGI's representations that it would manage the Fund with an eye towards managing risk, in particular the specific approach of buying put options to guard against market downturns.  The MTA Plaintiffs relied on these representations

when they invested, continued to invest, and when determining to remain invested in the Fund at various times throughout their investment.

76.     AllianzGI knew that the MTA Plaintiffs relied on its representations concerning the investment strategy when investing and remaining invested in the SA 1000 Fund.  In fact, in the Side Letter Agreements, AllianzGI agreed to "inform [the Plaintiffs] promptly in writing of . . . any material change in the investment strategies disclosed in the Company Documents."[36]

### F.     The Market Reacts to COVID and AllianzGI Abandons Its Strategies

77.     In January and February 2020, as the world began to take notice of the rising coronavirus threat, the global markets responded to the uncertainty and panic.  As the virus spread throughout the world, with the first deaths outside of China reported on February 2, 2020, large parts of Italy going into lock-down on February 25, 2020, cases appearing in Latin America on February 26, 2020, and cases of unknown origin appearing in the U.S. on the same day, the S&P 500 Index ("SPX") plummeted from its all-time closing high of 3,386 on February 19, 2020 to 2,954 on February 28, 2020 – a decrease of almost 13%.  Global stock markets reported the largest single-week decline since the 2008 financial crisis.

78.     While the stock indices were plummeting, volatility in the options markets was on the rise.  The VIX is a popular measure of the stock market's expectation of the volatility implied by S&P 500 index options.  It is calculated and disseminated on a real-time basis by the CBOE and is commonly referred to as the "fear index."  The VIX rose from 14.28 on February 19, 2020 to 40.11 on February 28, 2020 – an increase of over 280%.  As volatility – which measures the

---

[36] The parties agreed that the Side Letter Agreements would "have the effect of establishing rights under, or altering or supplementing the terms of, this Agreement with respect to the parties to such side letters." (LLC Agreement, § 2.13.)

fluctuation of prices over time – increases, so too does the risk associated with the underlying options products.

79.     This market turmoil was not lost on the Defendants.  Throughout February 2020, Mohamed El-Erian ("El-Erian"), Defendant Allianz SE's chief economist, acknowledged the potential for serious and sustained economic harm for investors.  On February 3, 2020, during an appearance on CNBC's *Squawk Box*, he warned investors against buying into the weak market, saying that doing so may be appropriate when the "shock is temporary, containable and reversible," but he said those are "phrases that are very hard to associate with coronavirus."[37]  On February 13, 2020, El-Erian told the Washington Post that he "worr[ied] that it's going to be a bigger deal than most economists are treating it as right now," and that "[i]t will take time to restart all these economic engines."[38]  On February 25, 2020, El-Erian again appeared on CNBC's *Squawk Box*, and again warned against investors assuming that markets would rebound quickly. Warning that "this is different," he said "I would continue to resist, as hard as it is, to simply buy the dip."  He added that "[w]e're going to have a lot of risk-aversion on the part of economic actors. It's going to take time," and "[e]conomic sudden stops are hard to restart."[39]  On February 27, 2020, El-Erian appeared on CNBC's *Closing Bell*, and again warned investors that it was too early to begin taking risks: "It's not yet safe in my opinion to get back into the market as a whole. You've got to let these economic and natural dynamics play out before the market is attractive enough for the sort of risk that is ahead."[40]

---

[37] https://www.cnbc.com/2020/02/03/why-central-banks-may-not-be-able-to-save-china-from-the-coronavirus.html.

[38]     https://www.washingtonpost.com/business/economy/economic-fallout-from-chinas-coronavirus-mounts-across-the-globe/2020/02/13/7bb69a12-4e8c-11ea-9b5c-eac5b16dafaa_story.html.

[39] https://www.cnbc.com/2020/02/25/mohamed-el-erian-continues-to-warn-against-buying-coronavirus-dips.html.

[40] https://www.cnbc.com/2020/02/27/markets-will-start-freezing-up-even-if-the-fed-cuts-rates-el-erian-says.html.

80.     The Defendants failed to take their own advice.  Amid this market chaos and rising volatility, AllianzGI negligently and imprudently departed from its much-hyped hedging strategy and assumed unreasonable risk.  Specifically, by the end of February 2020, AllianzGI had amassed an unreasonably risky position in short SPX puts – *i.e.*, selling insurance policies to other investors – that exposed the portfolio to heavy losses if the S&P 500 Index took a further downward swing. Specifically, by the end of February 2020, AllianzGI had a net short SPX put position of 31,636 contracts with strike prices between $2,400 and $2,900 in direct contravention to the previously represented strategy.  This was a ***substantial increase*** of their exposure from the end of January 2020 when they had a net short SPX put position of 8,400 contracts in the same strike range.  The SA 1000 Fund's short SPX put positions at the end of January and February 2020 are illustrated in the following table:

**Allianz Structured Alpha1000 SPX Short Puts [Strike Price 2400 to Strike Price 2950]**

|  | January 2020 | February 2020 | % Change |
|---|---|---|---|
| SPX Short Puts | 3,725 | 13,379 |  |
| SPXW Short Puts | 4,675 | 18,257 |  |
| Total SPX Short Puts [Strikes 2400 to 2950] | 8,400 | 31,636 | 276% |

81.     The apparent improper motive for AllianzGI's short SPX put position was to collect higher premiums and recoup some of the SA 1000 Fund's recent losses in January and February 2020 – which losses by that time were approximately 22% for the year.  Because the market was panicking, fewer puts were being sold, and because there were fewer puts on the market, the premium rates increased – an effect of the law of supply and demand.  In other words, more investors were reducing risk by buying insurance than were exposing themselves to more risk by selling insurance.  AllianzGI fell into the latter category.  It sought to take advantage of the increased premiums, but in doing so, it held far more risk than was reasonable or prudent.  In

effect, it was selling very expensive hurricane insurance when the hurricane was not far from shore. This was in direct conflict with its stated investment strategy, which called for long put hedging positions.  It was also inconsistent with what a reasonably prudent investment manager would have done in a similar situation.

82.     AllianzGI was motivated by the Incentive Allocation.  If the fund had no positive returns for the quarter and investors began to withdraw their funds, AllianzGI would receive no compensation.  Moreover, because of the structure of the Fund, AllianzGI knew that if it adhered to its investment strategy, it would take multiple quarters, if not years, to get back to even, meaning it would take multiple quarters, if not years, for AllianzGI to see any revenue for itself.  At the beginning of March, with only one month to go before quarter-end, AllianzGI therefore disregarded its strategy and took unreasonable risks with its investors' money to generate at least some returns, which in turn would generate some revenue for itself.  Out of greed, AllianzGI sacrificed the hard-earned pension and benefits of the MTA's workers, who at that time were risking their lives under COVID keeping New York alive.

83.     In effect, with the short SPX put position, AllianzGI bet the house that the market would rebound – a decision that AllianzGI knew or should have known was at odds with the advice of Allianz' Chief Economist and its own stated investment strategy.

84.     That strategy had called for maintaining long positions in SPX put options – in other words, taking out insurance policies that would protect the portfolio if the S&P 500 market fell dramatically.  Although AllianzGI did have long put options on the books at the end of February 2020, those puts were either so far out of the money or were set to expire so far into the future (or both) that they provided no effective protection from a downswing that a reasonable and prudent investor could have anticipated.

85.     Indeed, a downswing was precisely what AllianzGI's own marketing materials anticipated and purportedly planned for.  AllianzGI had told its investors that its hedging strategy involved layering SPX put options at strike prices 10-25% below at-market prices.  AllianzGI said this was intended to "protect the strategy from a short-term equity market crash," which it defined as "a decline of 10% to 15% in less than 5 days."

86.     But AllianzGI did not do that.  As of the end of February 2020, it had *no* put options between 10-20% out of the money, meaning it was not positioned to guard against a "short-term equity market crash," as it had defined that term.  In fact, approximately 57% of the Fund's long put options were between 31-50% out of the money, and almost 20% were more than 50% out of the money.  These long put option positions conflicted directly with AllianzGI's stated strategy and failed to provide reasonable protection against a downswing.  The SA 1000 Fund's long SPX put positions as of the end of February 2020, when the at-the-market price was $2,954, is illustrated in the following table:

**Allianz Structured Alpha1000 SPX Long Puts at February 28, 2020 [SPX at $2954]**

| Strike Range | % Out of Money | # of Contracts | % of Total |
|---|---|---|---|
| $2350 to $2075 | 20% to 30% | 17,985 | 23.4% |
| $2050 to $1800 | 31% to 40% | 33,312 | 43.4% |
| $1700 to $1500 | 41% to 50% | 10,666 | 13.9% |
| $1350 to $1100 | + 51% | 14,854 | 19.3% |
| Total SPX Long Puts | | 76,817 | |

87.     Part of the reason AllianzGI invested so heavily in these wildly out of the money put options was that they were all AllianzGI could afford at the time.  Given the dramatic swings in the VIX and SPX, the VIX term structure inverted, meaning that shorter-term VIX futures were trading at a premium to longer-term contracts, whereas normally shorter-dated options trade at a discount to longer term options.  This also meant that long puts closer to the at-the-market price –

*i.e.*, the types of puts that AllianzGI told investors it would buy – were trading at high prices. AllianzGI therefore settled for the less expensive option – buying puts further away from the at-the-market price that provided far less protection than those closer to the at-the-market price.

88.     In addition to the extremely risky short SPX put positions and the inadequate long put positions, AllianzGI was also short VIX calls at the end of February 2020.  And similar to how it increased the risk profile associated with the short SPX put position at the end of February, AllianzGI also increased the risk profile of the short VIX call position by increasing the number of contracts by 47% between the end of January and the end of February 2020.  This was the same directional bet as with the SPX put options because if the market continued to fall, the VIX would rise, and the SA 1000 Fund would suffer losses on the short VIX calls.  The SA 1000 Fund's short VIX call positions at the end of January and February 2020 are illustrated in the following table:

**Allianz Structured Alpha1000 VIX Short Calls**

|  | January 2020 | February 2020 | % Change |
|---|---|---|---|
| VIX Short Calls | 94,895 | 207,849 | |
| VIXW Short Calls | 49,436 | 4,934 | |
| Total VIX Short Calls | 144,331 | 212,783 | 47% |

89.     And yet a third unreasonable and imprudent directional position that AllianzGI made even more risky by the end of February 2020 was a short position in VXX calls.  The VXX is an exchange-traded-note that, like the VIX options, is tied to the underlying performance of the VIX index.  Typically, when the VIX index rises and the S&P 500 index falls, the VXX calls will increase in value.  In such a case, one who sells a VXX call stands to lose money because he/she will be bound to settle the contract at a price less than it is worth.  And yet, once again, AllianzGI

*increased* its short position in these risky VXX calls between the end of January 2020 and the end of February 2020, as illustrated in the following chart:[41]

**Allianz Structured Alpha1000 VXX, IPATH and FLEX Options**

|  | January 2020 | February 2020 | % Change |
|---|---|---|---|
| VXX Calls | 2,760 |  |  |
| VXX Flex Calls | 32,471 | 60,256 |  |
| IPATH Calls | 39,616 | 51,312 |  |
| Calendar VXX Calls | 2,435 | 2,435 |  |
|  | 77,282 | 114,003 | 47.5% |

90.     In sum, despite a highly volatile market that was trending downward, AllianzGI amassed a concentrated position in short SPX puts, short VIX calls, and short VXX calls, and failed to ladder its long put options to adequately protect against a sharp downward swing – each in direct conflict to its stated investment strategy and cumulatively exponentially more so.  This unreasonably and imprudently exposed the SA 1000 Fund to tremendous risk if the market dropped.

91.     Despite this unreasonable risk, AllianzGI tried to reassure investors.  On March 3, 2020, Allianz reported that as of the end of February 2020, the SA 1000 Fund was down nearly 22% for the year, but that it had recovered almost 40% of those losses in reported gains in the three trading days between February 28 and March 3, 2020.

92.     The reported gains were the result of a blip in the overall downward market trend.  During those three days, the S&P 500 rose from 2,954 to 3,003, and the VIX decreased from 40.11

---

[41] VXX Flex Calls, IPATH Calls, and Calendar VXX Calls are all variations of VXX Calls.  VXX Flex Calls are a non-standard version of VXX calls where the parties have negotiated certain terms; IPATH Calls are an exchange traded note that mimics VXX Calls; and Calendar VXX Calls are a calendar spread that involves the buying and selling of VXX Calls.  Each product will impact an investor's exposure to the VXX, carry VXX risk, and are often utilized by investors to trade VXX on a larger scale.

to 36.82.  AllianzGI's short put positions consequently increased in value.  AllianzGI then doubled-down and added to its directional bet that conditions would improve.

93.    In fact, although there were questions raised by investors about whether AllianzGI should exit its risky positions at this time by, among other things, buying back the short puts it had sold – a tactic referred to as "moving to cash" – AllianzGI made a deliberate decision to maintain those unreasonably risky positions.  This conflicted with AllianzGI's stated strategy, which, as noted above, specifically contemplated a "stop-loss" restructuring when a position became too risky.

94.    Not only was the move to cash something AllianzGI told its investors it would pursue, it was also entirely feasible in this case.  The options that AllianzGI was trading were not in any way exotic; they were exchange-traded options tied to the S&P 500 index.  Indeed, AllianzGI's described its portfolio as focused on "[s]imple, liquid, listed instruments."  Nor were the short put options so deep out of the money that they could not be covered.  In other words, the market for these options was liquid, and if AllianzGI had made the decision to exit the position, as it should have, it could have done so without difficulty.

95.    AllianzGI should also have known that it was violating its investment strategy to wager on market conditions improving.  The following table depicts the day-to-day swings of the SPX and VIX leading up to the end of February.  It demonstrates the extreme volatility in the market, the steady dip in the SPX and the steady rise in the VIX, and indicates – at least in the eyes of a reasonably prudent investment manager – that a directional bet was even riskier than under normal market conditions.  It was also in direct conflict with AllianzGI's promise to "[n]ever make a forecast on the direction of equities or volatility."

**VIX and SPX Prices February 14, 2020 to March 17, 2020**

| Date | VIX High | VIX Close | SPX Close |
|------|----------|-----------|-----------|
| 2/14/2020 | 14.54 | 13.68 | 3380.16 |
| 2/18/2020 | 15.49 | 14.83 | 3370.29 |
| 2/19/2020 | 14.74 | 14.38 | 3386.15 |
| 2/20/2020 | 17.21 | 15.56 | 3373.23 |
| 2/21/2020 | 18.21 | 17.08 | 3337.75 |
| 2/24/2020 | 26.35 | 25.03 | 3225.89 |
| 2/25/2020 | 30.25 | 27.85 | 3128.21 |
| 2/26/2020 | 29.57 | 27.56 | 3116.39 |
| 2/27/2020 | 39.31 | 39.16 | 2978.76 |
| 2/28/2020 | 49.48 | 40.11 | 2954.22 |
| 3/2/2020 | 40.41 | 33.42 | 3090.23 |
| 3/3/2020 | 41.06 | 36.82 | 3003.37 |
| 3/4/2020 | 35.58 | 31.99 | 3130.12 |
| 3/5/2020 | 42.84 | 39.62 | 3023.94 |
| 3/6/2020 | 54.39 | 41.94 | 2972.37 |
| 3/9/2020 | 62.12 | 54.46 | 2746.56 |
| 3/10/2020 | 55.66 | 47.30 | 2882.23 |
| 3/11/2020 | 55.82 | 53.90 | 2741.38 |
| 3/12/2020 | 76.83 | 75.47 | 2480.64 |
| 3/13/2020 | 77.57 | 57.83 | 2711.02 |
| 3/16/2020 | 83.56 | 82.69 | 2386.13 |
| 3/17/2020 | 84.83 | 75.91 | 2529.19 |

96.     The directional bet proved to be the SA 1000 Fund's unraveling.  On March 9, 2020, the VIX rose to 54.46 and the S&P 500 fell to $2,746.56 – changes of +70% and -12%, respectively, from March 3.  As a result of the rapid rise in volatility and dramatic drop in the S&P 500, the value of the SA 1000 Fund's extremely risky short positions plummeted.

97.     On March 9, 2020, the SA 1000 Fund's prime brokers – the banks that hold the fund's collateral – made margin calls, meaning they demanded that the SA 1000 Fund provide additional cash to cover the decreased value of the portfolio.  AllianzGI was unable to meet the prime brokers' margin calls largely because the short positions had lost so much value (*i.e.*, profit from the premiums at which AllianzGI sold the insurance was far outweighed by the value of the

purchasers' claims that came due) and the long put positions were inadequate to generate sufficient cash.

98.     Things only got worse from there.  On March 11, 2020, the World Health Organization made the assessment that COVID-19 could be officially described as a pandemic due to the rapid increase in cases worldwide.  The markets collapsed.  The S&P 500 fell 4.8% on March 11, 2020 and 9.5% on March 12, 2020.  In the same span, the VIX soared from 53 to 75 – an increase of almost 42%.

99.     On March 13, 2020, AllianzGI reported that the SA 1000 Fund was down 52% for the year.  Despite this, and despite all indications that its decision to stay the course with a directional bet was proving disastrous, AllianzGI still did not exit its positions, move to cash, or otherwise hedge against further losses.  This would prove catastrophic.

100.    On March 17, 2020, AllianzGI reported that the SA 1000 Fund was down almost 87% for the year.  AllianzGI was still unable to meet the prime brokers' demands, and by this time, the brokers had taken over the fund.

101.    As the S&P 500 continued to fall throughout the month of March, eventually reaching $2,237 on March 23, 2020 – a decline of over 24% since the end of February – it became clear that AllianzGI had not only failed to implement its hedging strategies, it had actually structured its positions for maximum damage.  In fact, as noted above, as of the end of February 2020, AllianzGI's portfolio had amassed a concentrated net position of over 31,000 S&P 500 short put contracts with strike prices between $2,900 and $2,400.  This meant that if the index fell below those prices, AllianzGI would suffer crippling losses.  As it turned out, that was almost exactly the way the market moved – from $2,954 at the end of February to $2,237 on March 23.  AllianzGI could not have positioned the portfolio more directly in contravention of its professed investment

strategy, and without adequate hedges in place, it had no way to stem the losses, which resulted in catastrophic harm to the MTA Plaintiffs.

G.   **Risk Assessments of the SA 1000 Fund's Positions At the End of January and February 2020 Unequivocally Show That the Fund Had Jettisoned Its Investment Strategy and Made A Massive Directional Bet**

102.   An analysis of the portfolio's risk profile as of the end of January and February 2020 clearly demonstrates, in real-time, the magnitude of AllianzGI's irresponsible and unreasonable directional bet.  The following tables represent the results of the type of risk assessments that prudent investment managers conduct on a day-to-day basis and that AllianzGI told investors it was conducting.  These assessments are based on the portfolio's positions as of the end of January and February 2020 as well as price data from the CBOE at the time.  They are designed to show how the fund will perform under various potential future market scenarios and they are routinely used by traders and fund managers to assess the amount of risk on their books.

103.   Risk Table 1 below depicts the risk associated with the SA 1000 Fund's positions in SPX options as of January 31, 2020.  The horizontal axis represents movement in the S&P 500 – from which SPX options are derived – at standard deviations to the positive and to the negative.[42] The vertical axis represents increased or decreased volatility using values derived from the implied volatility applied by the market to certain relevant products.  The "Equity" row represents the results with no volatility movement.  The "Net P&L" row represents the same but incorporates the theoretical value of the position and estimates how the fund would perform if these positions remained static through the following market close.  Negative values in red indicate that the

---

[42] Since the risk tables look at consolidated risk for *all* SPX options, there is no one value to represent the precise standard deviation changes in numerical terms, which differ from product to product.  But as an example for context, as of this date, the -4/+4 standard deviation price range for the front-month February SPX futures (*i.e.*, the SPX options due to expire in February), which traded at $3,215, was $2,927 to $3,503.

position was poised to lose value in that scenario; positive values in black indicate that the position was poised to gain value in that scenario.

**Risk Table 1: Risk Assessment of SPX Options, as of January 31, 2020 [USD]**

|          | -4 | -3 | -2 | -1 | 0 | +1 | +2 | +3 | +4 |
|----------|----|----|----|----|----|----|----|----|----|
| Vol(1.00) | -232,605,603 | -140,351,154 | -73,831,001 | -30,457,883 | -4,747,093 | 9,134,486 | 15,497,908 | 16,955,762 | 15,132,484 |
| Equity:  | -224,491,142 | -131,718,510 | -65,857,905 | -23,994,023 | 0 | 12,467,645 | 17,845,280 | 18,615,836 | 16,268,812 |
| Vol(-1.00) | -216,365,253 | -123,077,671 | -57,966,573 | -17,750,277 | 4,429,982 | 15,478,393 | 19,931,794 | 20,082,772 | 17,253,664 |
| Net P&L: | -228,135,450 | -135,362,818 | -69,502,212 | -27,638,330 | -3,644,308 | 8,823,337 | 14,200,973 | 14,971,529 | 12,624,504 |

104.    The assessment – which is forward-looking in nature and represents what an investment manager would have seen at the time – shows that the portfolio was positioned to lose tremendous value if the SPX moved even one standard deviation down.  The SPX positions as of January 31, 2020 stood to lose significant value in every scenario in which the SPX went down and that it was poised to gain only where the market improved.  Even in the scenario where there was no market movement, the Net P&L was still in the red.  This directly contradicted AllianzGI's stated strategy to "outperform irrespective of the market environment" and to "[n]ever make a forecast on the direction of equities or volatility." In fact, contrary to AllianzGI's investment strategy, the portfolio stood to profit only if the market increased or volatility stabilized

105.    The risk profile only got worse between January and February.  Risk Table 2 below depicts the risk associated with the SA 1000 Fund's positions in SPX options as of February 28, 2020.[43]  Not only was the portfolio once again positioned to lose significant value in any downward movement (contrary to AllianzGI's investment strategy), the risks were actually increased by orders of magnitude compared to the end of January.  The maximum risk in the SA 1000 Fund's

---

[43] As of this date, the -4/+4 standard deviation price range for the front-month March SPX futures (*i.e.*, the SPX options due to expire in March), which traded at $2,876, was $2,114 to $3,638.

SPX options positions had increased from approximately $232 million at the end of January to $1.05 billion at the end of February.

**Risk Table 2: Risk Assessment of SPX Options, as of February 28, 2020 [USD]**

| | -4 | -3 | -2 | -1 | 0 | +1 | +2 | +3 | +4 |
|---|---|---|---|---|---|---|---|---|---|
| Vol(10.00) | -1,037,408,593 | -835,222,615 | -585,857,419 | -338,017,540 | -127,399,078 | 28,816,850 | 131,243,362 | 190,423,457 | 219,447,798 |
| Equity: | -1,043,331,434 | -801,332,879 | -510,630,763 | -229,135,464 | 0 | 157,286,373 | 248,759,618 | 292,027,716 | 301,805,578 |
| Vol(-10.00) | -1,056,401,397 | -768,832,957 | -433,194,913 | -118,144,107 | 123,097,313 | 267,824,815 | 335,826,287 | 359,581,246 | 352,764,299 |
| Net P&L: | -1,101,894,630 | -859,896,074 | -569,193,959 | -287,698,660 | -58,563,196 | 98,723,178 | 190,196,422 | 233,464,520 | 243,242,383 |

106.     The risk associated with the SA 1000 Fund's positions in VIX options displays a similar pattern.  Risk Table 3 below depicts the risk associated with the SA 1000 Fund's positions in VIX options as of January 31, 2020.[44]  Here, the Fund stood to lose significant value in any scenario where the VIX increased (*i.e.*, where volatility increased), and stood to gain value only where the VIX decreased.

**Risk Table 3: Risk Assessment of VIX Options, as of January 31, 2020 [USD]**

| | -4 | -3 | -2 | -1 | 0 | +1 | +2 | +3 | +4 |
|---|---|---|---|---|---|---|---|---|---|
| Vol(10.00) | 139,975,485 | 134,504,191 | 116,728,538 | 69,696,007 | -27,784,264 | -191,661,014 | -422,577,514 | -706,574,482 | -1,027,552,273 |
| Equity: | 140,940,866 | 137,679,217 | 125,153,430 | 86,997,923 | 0 | -155,504,960 | -382,704,412 | -666,391,591 | -988,548,547 |
| Vol(-10.00) | 141,470,794 | 139,789,825 | 131,720,448 | 102,163,440 | 26,132,989 | -120,212,496 | -343,445,816 | -626,892,863 | -950,312,760 |
| Net P&L: | 138,995,494 | 135,733,844 | 123,208,057 | 85,052,550 | -1,945,373 | -157,450,333 | -384,649,785 | -668,336,964 | -990,493,919 |

107.     As with the SPX options, the risk profile for the VIX options only got worse from January to February 2020.  Risk Table 4 below depicts the risk associated with the SA 1000 Fund's positions in VIX options as of February 28, 2020.[45]  It clearly shows that AllianzGI negligently and imprudently increased the portfolio's risk profile at a time when the market was plummeting and volality was soaring.  In fact, the maximum risk of the SA 1000 Fund's VIX positions as of this date, as shown in Risk Table 4, was over $3.1 billion, or over 3 times the maximum risk from

---

[44] As of this date, the -4/+4 standard deviation price range for the VIX front-month February VIX futures (*i.e.*, the VIX options due to expire in February), which traded at 18.61, was 6.41 to 30.81.

[45] As of this date, the -4/+4 standard deviation price range for the VIX front-month March VIX futures (*i.e.*, the VIX options due to expire in March), which traded at 27, was 5.8 to 48.2.

the SA 1000 Fund's VIX positions as of the previous month's end – an amount that decimated the fund.

**Risk Table 4: Risk Assessment of VIX Options, as of February 28, 2020 [USD]**

|  | -4 | -3 | -2 | -1 | 0 | +1 | +2 | +3 | +4 |
|---|---|---|---|---|---|---|---|---|---|
| Vol(14.15) | 125,730,507 | 293,246,408 | 364,352,782 | 252,071,270 | -99,618,507 | -676,895,603 | -1,414,246,511 | -2,251,622,078 | -3,151,048,863 |
| Equity: | 130,680,711 | 308,287,209 | 403,894,068 | 325,357,722 | 0 | -573,122,297 | -1,319,102,145 | -2,167,540,684 | -3,077,040,522 |
| Vol(-14.15) | 134,171,537 | 319,668,991 | 437,501,876 | 392,665,481 | 97,100,041 | -472,717,560 | -1,229,388,941 | -2,089,635,187 | -3,009,162,217 |
| Net P&L: | 131,774,065 | 309,380,563 | 404,987,422 | 326,451,076 | 1,093,354 | -572,028,943 | -1,318,008,791 | -2,166,447,329 | -3,075,947,168 |

108.    Had AllianzGI conducted risk assessments, like it promised it would, results like these would have set off alarm bells throughout the organization.  AllianzGI either failed to conduct the tests or simply buried the results because the tests show with devastating clarity that the SA 1000 Fund was positioned not only in direct conflict with AllianzGI's stated investment strategy, but also in a manner that was wildly irresponsible, negligent, and imprudent given the circumstances.

109.    Additonally, the risk/reward balance was entirely out of whack.  In each and every scenario above, the prospect of potential gains if the underlying indices moved by a standard deviation in one direction were ***far outweighed*** by the threat of exponential losses if the underlying indices moved by a standard deviation in the opposite direction.  In other words, the risks AllianzGI was assuming were not in any way justified by the potential rewards.

**H.    Allianz SE Failed to Back the Fund**

110.    There was also no financial backing from Allianz SE.  In fact, the MTA Plaintiffs asked repeatedly whether Allianz SE would back the Fund and AllianzGI responded that it would not.  Allianz SE's decision not to back the Fund was unreasonable, imprudent, and a missed opportunity.  It is a vital risk management component for any fund with corporate backing to have the parent exercise control and oversight – among other things, it keeps managers in check and protects against rogue or unreasonable positions, like those at issue here.  In fact, as part of its

Structured Alpha 1000 pitchbooks provided to investors, AllianzGI touted the risk management expertise of Allianz SE's wholly-owned subsidiary, IDS GmbH, as something that would benefit the SA 1000 Fund.

111.   The lack of corporate backing became particularly problematic as the SA 1000 Fund's prime brokers began to make margin calls on its accounts.  Essentially, as the value of the SA 1000 Fund's portfolio began to decline, the prime brokers that hold the Fund's collateral demanded that the Fund provide more cash to cover the declining value.  To do so, AllianzGI should have gone to Allianz SE, which could have covered the margin calls and kept the Fund afloat long enough to weather the downturn.  It did not do so, despite telling investors that the broader resources of the firm would provide protection.  As a result, the SA 1000 Fund could not cover its losses.

### I.   The SA 1000 Fund is Liquidated and the MTA Investors Suffer Harm

112.   The MTA Plaintiffs recognized by early-March 2020 that AllianzGI had lost control of the SA 1000 Fund and tried to redeem its investments before they incurred any further losses.  AllianzGI would not permit the MTA Plaintiffs to redeem until the end of April 2020.

113.   On March 25, 2020, AllianzGI sent a letter to the MTA Plaintiffs concerning the "Orderly Liquidation of AllianzGI Structured Alpha 1000 LLC."  The letter said that AllianzGI had "determined that it is in the best interests of the Fund's investors to proceed to an orderly liquidation of the Fund."  The letter attributed the losses to the global market downturn, notwithstanding that the Fund's strategy, as originally designed, specifically anticipated and took measures to minimize the impact of such an event.  "As you know, the global markets have over the past weeks experienced severe turmoil and volatility, based in part on the ongoing coronavirus pandemic and other concerns.  Despite significant efforts by the investment team to navigate the recent downturn, the Fund experienced significant losses."

114.    On April 23, 2020, the MTA Plaintiffs redeemed what was left of their investments in the SA 1000 Fund.  The MTA Retiree Benefits Plan redeemed $644,124.00 (from an account balance of $23,540,148.14 on December 31, 2019); the MTA Master Trust redeemed $5,246,860.64 (from an account balance of $191,751,709.49 on December 31, 2019); and the MaBSTOA Pension Plan redeemed $3,157,774.78 (from an account balance of $115,404,001.35 on December 31, 2019).  All told, as a result of AllianzGI's negligent and imprudent mismanagement of the Fund, the MTA Plaintiffs lost an astonishing *97.26%* of the value of their investments between December 31, 2019 and the final redemptions on April 23, 2020.

### J.    AllianzGI's Negligence and Imprudence Comes to Light

115.    When compared to the performances of other hedge fund managers during the first quarter of 2020, the SA 1000 Fund's results bring AllianzGI's negligence into sharp focus. According to an industry-wide analysis conducted by eVestment – a Nasdaq company that provides institutional investment data, analytics, and market intelligence – by the end of March 2020, hedge funds in general were down approximately 10% for the year and funds that focused specifically on volatility/options strategies were actually *up* 1.14% for the year.[46]  In contrast, the SA 1000 Fund, which also focused on volatility/options strategies, was down almost 87% by mid-March, was liquidated by the end of March, and, as noted above, would ultimately lose *over 97%* of the MTA Plaintiffs' investments.

116.    Multiple industry analysts cast the blame for the Fund's disastrous performance squarely at AllianzGI's feet.  On March 27, 2020, Aon plc, a leading investment management research firm, issued a non-public "Flash Report" faulting AllianzGI and blaming the Fund's demise on AllianzGI's mismanagement.  According to Aon, "[t]he losses experienced by the

---

[46] https://www.evestment.com/news/hedge-fund-returns-varied-in-march-amid-elevated-volatility/.

Structured Alpha strategy in a time of sharp equity market losses are at odds with the risk profile described by the Allianz team and illustrated in the stress testing they provided."  Aon further criticized AllianzGI's "lack of appropriate independent risk controls to prevent the portfolio from being exposed to significant downside risk."  In addition, according to Aon, "[w]hen Allianz restructured the portfolio after the initial equity market sell-off, the hedges were not positioned to properly offset the risk of the short put options in a continued market decline."  The report blamed AllianzGI for failing to accept "modest losses and aim to recover in a reasonable time period as Allianz has done in previous volatility episodes," and instead engaging in "multiple discretionary restructuring efforts [that] exposed the portfolio to further downside risk."  The report similarly denounced AllianzGI for having "been less forthcoming with information than we would have hoped in such a critical time for investors."

117.    Morningstar, another global financial services firm, also concluded that AllianzGI's mismanagement contributed to the fund's failure.[47]  According to Morningstar, while it had "previously noted [AllianzGI's] strategy's robust risk management, it suffered inordinate loses when volatility shot up in February and March, prompting concerns regarding the strategy's execution."  The "deep out-of-the money put options" that the hedging strategy purportedly used "in greater quantity than short-volatility contracts … did not shield the rest of the portfolio as expected in March."  Rather, according to Morningstar, the volatile market "exposed a weakness in the strategy that can result in sizable left tail risk, or huge losses."  That "weakness" was AllianzGI's negligent disregard of its highly marketed investment strategy.

118.    Regulators have also set their sights on the Defendants.  On August 5, 2020, Allianz reported in its "First Half-Year 2020" report that AllianzGI received an "information request from

---

[47] *See* https://finance.yahoo.com/news/allianz-structured-return-085800247.html.

the U.S. Securities and Exchange Commission (SEC) regarding AllianzGI's Structured Alpha funds, and is fully cooperating with the SEC."[48]

119.    In a telltale sign that AllianzGI had negligently and imprudently mismanaged the SA 1000 Fund, it refused to provide its investors with basic information they requested.  In May 2020, after the Fund had been liquidated, certain investors requested information from AllianzGI concerning, among other things, its daily holdings, daily trade records, valuation assessments, daily exposures, daily attributions, and risk management.  AllianzGI refused to provide the information, citing concerns about "selective disclosure," even though by that time the Fund had been liquidated and was no longer in operation.

## V.    CAUSES OF ACTION

**COUNT I**

**NEGLIGENCE**

120.    Plaintiffs incorporate all preceding paragraphs by reference as if fully set forth herein.

121.    AllianzGI owed a duty of care to the MTA Plaintiffs to manage its pension and benefit plans as a reasonably prudent investment manager would do under similar circumstances, including to implement the risk management and hedging strategies it represented both before and during the MTA Plaintiffs' investments.

122.    AllianzGI agreed to "exercise the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  AllianzGI

---

[48] https://www.allianz.com/content/dam/onemarketing/azcom/Allianz_com/investor-relations/en/results/2020-2q/en-interim-report-2q-2020.pdf.

further agreed that it would be liable to the MTA Plaintiffs for "losses arising from . . . [AllianzGI's] negligence, and separately that it would be liable when its "action or inaction . . . constitutes . . . negligence."

123.    The PPM states that AllianzGI would be liable to investors for "losses arising from . . . [Allianz's] negligence."[49]   The LLC Agreement states that AllianzGI would be liable when its "action or inaction . . . constitutes . . . negligence."

124.    The MTA Plaintiffs detrimentally relied on AllianzGI's representations of how it would manage the Fund, in particular how it would manage and hedge against risk during times of market volatility.

125.    AllianzGI breached its duty of care by failing to implement its hedging strategy designed to minimize loss and maximize profits even during sharp market downturns; taking on additional risk at a time when a prudent investment manager would be reducing risk; failing to liquidate or at least reduce its positions in risky short SPX puts and short VIX and VXX calls; failing to implement the risk management protocols outlined in its presentations; and failing to conduct adequate stress tests, risk assessments, and real-time monitoring of positions, or ignoring the data produced by these activities if they were conducted.

126.    Defendant Allianz SE, as a principal, is liable for the actions of AllianzGI, its agent, under principles of agency and respondeat superior.  At all relevant times, Allianz SE exerted a "dominant" influence over and controlled AllianzGI.  At all relevant times, AllianzGI acted within the scope of its role as Allianz SE's agent.

---

[49] PPM, pg. 31.

127.    As a direct result of AllianzGI's mismanagement of the SA 1000 Fund and its breach if its duty of care, the MTA Plaintiffs suffered actual damages in an amount to be determined at trial, but exceeding $75,000.

## COUNT II

## BREACH OF CONTRACT

128.    Plaintiffs incorporate all preceding paragraphs by reference as if fully set forth herein.

129.    Allianz and the MTA Plaintiffs were parties to a series of lawful contracts between 2008 to around April/May 2020, namely the SA 1000 Agreements.

130.    The SA 1000 Agreements obligated AllianzGI to engage in a strategy to "consist of investments in puts and calls on equity indices through the use of a proprietary model to construct option spreads" with the "objective [of] creating option based profit zones that, upon expiration of the options, will capture positive payoffs if the level of the underlying index (or other instrument) ends up within the profit zone."   AllianzGI was obligated to "to optimize spread positions and profit zones based on (a) targeted positive return potential, (b) structural risk protections, (c) collateral management, and (d) flexibility to restructure profit zones if necessary." AllianzGI failed to do so.

131.    Specifically, among other things, AllianzGI failed to structure adequate spread and risk positions, appropriately manage collateral, and restructure profit zones.

132.    The SA 1000 Agreements further obligated AllianzGI to "inform [the Plaintiffs] promptly in writing of . . . any material change in the investment strategies disclosed in the Company Documents."   AllianzGI failed to do so.

133.    And the SA 1000 Agreements obligated AllianzGI to "develop the appropriate systems and procedures to control operational risk" including risk management systems.[50] AllianzGI failed to develop the appropriate risk management systems, or if such systems were in place, AllianzGI failed to adequately utilize the system or implement its findings.

134.    The MTA Plaintiffs complied with all of their obligations under the SA 1000 Agreements.

135.    Defendant Allianz SE, as a principal, is liable for the actions of AllianzGI, its agent, under principles of agency and respondeat superior.  At all relevant times, Allianz SE exerted a "dominant" influence over and controlled AllianzGI.  At all relevant times, AllianzGI acted within the scope of its role as Allianz SE's agent.

136.    As a direct result of AllianzGI's breaches, the MTA Plaintiffs suffered actual damages in an amount to be determined at trial, but exceeding $75,000.

## COUNT III

## BREACH OF FIDUCIARY DUTY

137.    Plaintiffs incorporate all preceding paragraphs by reference as if fully set forth herein.

138.    A fiduciary relationship was created between AllianzGI and the MTA Plaintiffs by virtue of AllianzGI's service as the Managing Member and investment manager of AllianzGI Structured Alpha 1000 LLC, a Delaware limited liability company.  In this role, AllianzGI undertook the responsibility to invest the MTA Plaintiffs' funds prudently and in so doing, to also exercise the utmost good faith and undivided loyalty toward the MTA Plaintiffs throughout the relationship.

---

[50] PPM, at pg. 34.

139.    AllianzGI expressly agreed to act as a fiduciary.  AllianzGI agreed that "for so long as the assets of the [SA 1000] Fund are treated as 'plan assets' for purposes of ERISA, the Managing Member is a 'fiduciary,' as such term is defined by ERISA."

140.    AllianzGI also agreed that "[d]uring any such time that the assets of the Fund are not treated as 'plan assets' for purposes of ERISA . . .  the Managing Member nevertheless will use its reasonable best efforts to discharge its duties consistent with the standard of care imposed on plan fiduciaries under Section 404(a)(1)(B) of ERISA."

141.    The PPM further states that AllianzGI's "[c]onduct outside the safe harbor afforded by Section 28(e) [of the Securities Exchange Act of 1934] is subject to the traditional standards of fiduciary duty under state and federal law."

142.    The MTA Plaintiffs' reposed trust and confidence in AllianzGI to serve competently and prudently as an investment manager and the Managing Member of the SA 1000 Fund, which was organized as a Delaware limited liability company.  AllianzGI accepted that trust as evidenced by, among other things, the terms of the SA 1000 Agreements and its serving as Managing Member.

143.    AllianzGI violated this duty of care by imprudently failing to exercise appropriate caution in a volatile marketplace and by deviating from the stated strategy of the Fund. Specifically, AllianzGI failed to de-risk the SA 1000 Fund's portfolio by continuing to sell put options during a market dislocation rather than attempting to liquidate positions in order to stop losses; abandoned the explicit strategy whereby SA 1000 operates as a "net buyer" of put options rather than selling such contracts; failed to implement the hedging strategy designed to minimize loss and maximize profits even during sharp market downturns; failed to conduct adequate stress tests, risk assessments, and real-time monitoring of positions, or ignoring the data produced by

these activities if they were conducted; and sought to maximize its own profits by recklessly assuming highly risky positions and in the process putting the MTA Plaintiffs' investments at unreasonable risk of loss.

144.    Defendant Allianz SE, as a principal, is liable for the actions of AllianzGI, its agent, under principles of agency and respondeat superior.  At all relevant times, Allianz SE exerted a "dominant" influence over and controlled AllianzGI.  At all relevant times, AllianzGI acted within the scope of its role as Allianz SE's agent.

145.    As a direct result of AllianzGI's imprudent mismanagement of the SA 1000 Fund and its breach if its duty of care, the MTA Plaintiffs suffered actual damages in an amount to be determined at trial, but exceeding $75,000.

## COUNT IV

## VIOLATION OF SECTION 404(a)(1)(B) OF ERISA

146.    Plaintiffs incorporate all preceding paragraphs by reference as if fully set forth herein.

147.    Section 404(a)(1)(B) of ERISA states that "a fiduciary shall discharge his[/her] duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent [person] acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B).

148.    AllianzGI agreed in the PPM that "for so long as the assets of the Fund are treated as 'plan assets' for purposes of ERISA, the Managing Member is a 'fiduciary,' as such term is defined by ERISA."

149.    AllianzGI agreed in the LLC Agreement that "to the extent that the underlying assets of the Company constitute 'plan assets' within the meaning of ERISA . . . [AllianzGI], in its capacity as 'investment manager' of the Company . . . shall at all times discharge its duties consistent with the standard of care imposed on fiduciaries under ERISA and/or Section 4975 of the [Internal Revenue] Code."

150.    AllianzGI also agreed in its Side Letters that "during such times when the Fund is deemed to hold 'plan assets' . . .  the provisions of Title I of ERISA shall be deemed to govern the conduct, responsibilities and liabilities of the Managing Member with respect to the Subscriber [and] the Managing Member will act as a fiduciary as if the Subscriber was subject to Title I of ERISA."

151.    In addition, AllianzGI agreed in the PPM that "[d]uring any such time that the assets of the Fund are not treated as 'plan assets' for purposes of ERISA . . .  the Managing Member nevertheless will use its reasonable best efforts to discharge its duties consistent with the standard of care imposed on plan fiduciaries under Section 404(a)(1)(B) of ERISA."[51]

152.    In the LLC Agreement, AllianzGI agreed to "[t]o the extent that the underlying assets of the Company do not constitute Plan Assets [under ERISA], Allianz Global Investors U.S. LLC, in its capacity as 'investment manager' of the Company . . . shall at all times use its reasonable best efforts to discharge its duties consistent with the standard of care imposed on fiduciaries under Section 404(a)(1)(B) of ERISA."[52]

---

[51] PPM, pg .58.

[52] LLC Agreement, Section 2.12, pg. 11.

153.    The SA 1000 Fund held plan assets at all relevant times, in particular during the months of January, February, and March 2020, because benefit plan investors held more than 25% of the SA 1000 Fund's equity interest during that time.

154.    The investors' interests in the SA 1000 Fund were not publicly-offered securities or securities issued by an investment company registered under the Investment Company Act of 1940.  The SA 1000 Fund was not an operating company, as defined by ERISA.

155.    AllianzGI exercised authority and control respecting the management and disposition of the SA 1000 Fund's underlying assets.

156.    As per the terms of the SA 1000 Agreements, AllianzGI owed the MTA Plaintiffs a duty pursuant to Section 404(a)(1)(B) to, among other things, discharge its duties with the "care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

157.    AllianzGI violated this duty of prudent care by failing to act as a prudent fiduciary would in like circumstances.  Specifically, AllianzGI:

      a.    failed to de-risk the SA 1000 portfolio by liquidating or reducing risky positions, including its positions in short SPX put options and short VIX and VXX call options;

      b.    failed to adhere to its explicit strategy whereby SA 1000 operates as a "net buyer" of put options rather than selling such contracts;

      c.    failed to implement the hedging strategy designed to minimize loss and maximize profits even during sharp market downturns;

    d.   failed to conduct adequate stress tests, risk assessments, and real-time monitoring of positions, or at least heed the data produced by these activities if they were conducted;

    e.   sought to maximize its own profits by unreasonably assuming directional risk and in the process putting the MTA Plaintiffs' investments at unreasonable risk of loss.

158.   Defendant Allianz SE, as a principal, is liable for the actions of AllianzGI, its agent, under principles of agency and respondeat superior.  At all relevant times, Allianz SE exerted a "dominant" influence over and controlled AllianzGI.  At all relevant times, AllianzGI acted within the scope of its role as Allianz SE's agent.

159.   As a direct result of AllianzGI's violation of Section 404(a)(1)(B) of ERISA, the MTA Plaintiffs suffered actual damages in an amount to be determined at trial, but exceeding $75,000.

## VI.   PRAYER FOR RELIEF

160.   Wherefore, the MTA Plaintiffs pray for judgment as follows:

    a.   A declaration that the Defendants are liable for negligence in connection with the mismanagement of the SA 1000 Fund, causing the Plaintiffs' losses;

    b.   A declaration that the Defendants are liable for breach of contract, causing the Plaintiffs' losses;

    c.   A declaration that the Defendants are liable for breach of the fiduciary duty they owed to the Plaintiffs, causing the Plaintiffs' losses;

    d.   A declaration that the Defendants breached the fiduciary duty they owed to the Plaintiffs under ERISA, causing the Plaintiffs' losses;

    e.   A money judgment against Defendants in an amount exceeding $75,000, to be determined at trial;

    f.   An Order awarding pre- and post-judgment interest to Plaintiffs; and

    g.   Any other relief the Court may deem just and proper.

161.    Plaintiffs demand a jury trial.


Dated: September 23, 2020           Respectfully submitted,

            **BLEICHMAR FONTI & AULD LLP**

            */s/ Javier Bliechmar*

            Javier Bleichmar
            George N. Bauer
            7 Times Square, 27th Floor
            New York, New York 10036
            Telephone: (212) 789-1340
            Facsimile: (212) 205-3960
            jbleichmar@bfalaw.com
            gbauer@bfalaw.com

            *Counsel for Plaintiffs*


            **CALCATERRA POLLACK LLP**

            Regina Calcaterra
            Justin Teres
            1140 Avenue of the Americas, 9th Floor
            New York, New York 10036
            Telephone: (212) 899-1760
            rcalcaterra@calcaterrapollack.com
            jteres@calcaterrapollack.com

            *Counsel for Plaintiffs*